EVA MARTA PIAZZA CINTRÓN ET AL., Plaintiffs and Appellees, *v.* JOSÉ AMÉRICO PIAZZA OLAYA ET AL., Defendants and Appellants.

No. 12152. Decided September 8, 1961.

*Luciano Colón* for plaintiffs-appellees. *Leopoldo Tormes García* for defendants-appellants.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

Upon the death of Alejandro Piazza Massini, which occurred on August 20, 1949, he was succeeded by his six children as his intestate heirs, to wit: José Américo, Alejandro Antonio, Ana Beatriz, Nuncia Josefa, Esther Elena, and Asunción María, all surnamed Piazza Olaya. Among the estate left at the death of said predecessor there was a 200-cuerda farm called Concepción, located in the ward of Aguas Blancas of Yauco. This estate had been administered for more than twenty-five years by defendant José Américo Piazza Olaya, who continued in charge thereof after the death of his father "by virtue of a family agreement." The farm was devoted to the growing of coffee, vegetables, and fruits, and periodically, the heir Alejandro Antonio received certain amounts of money as his share in the fruits.

Alejandro Antonio Piazza Olaya died on February 5, 1953 under an open will, wherein after having bequeathed the free third to his niece Ana Carmen Piazza Moreschi, defendant's daughter, he appointed his only daughter Eva Marta Piazza Cintrón as his universal heir, without prejudice to the usufructuary quota which corresponded to his widow, Cándida Cintrón. The undivided one-sixth interest corresponding to the testator in the Concepción farm was recorded at the Registry of Property, two thirds in favor of Eva

Marta, and one third in favor of the legatee. *Piazza* v. *Registrar*, 78 P.R.R. 288 (1955).

On April 15, 1952 the defendant acquired the undivided interests in the afore-mentioned farm belonging to his sisters Nuncia Josefa, Esther Elena, and Asunción María; and on May 8, 1953, that of his sister Ana Beatriz. The sale was made for $2,166.66 for each undivided interest, of which sum the amount of $1,000 was paid at the execution, and the balance of $1,166.66 was used to pay the corresponding part of a credit for the total amount of $7,000 which had been acknowledged as a debt by the heirs of Piazza-Olaya to their brother José Américo, for his administrative duties in the farm.

On May 5, 1953 plaintiffs sold to defendant the joint ownership of two thirds of one sixth and the usufructuary right which was recorded over the Concepción farm and personally appeared at the execution of the corresponding public deed. The conditions of sale were similar to those agreed to by the sisters of the purchaser, that is, a specific amount was received in cash and the proportionate part which the late Alejandro Antonio was to pay of the credit in favor of José Américo for his duties as administrator, was acknowledged in the liquidation of the price. And, finally, on June 3, 1953, Ana Carmen Piazza sold to defendant the remaining joint ownership of a third of one sixth, thereby consolidating his title of ownership over the whole farm.[1]

In the will executed by Alejandro Antonio Piazza, defendant was appointed as executor "with the corresponding legal faculties, in order that he shall proceed, when the time comes, to make the inventory so as to liquidate, divide, and adjudicate his property, taking the necessary steps and doing

---

[1] Plaintiff Eva Marta Piazza received $900 in cash for her joint ownership of *two thirds* of one sixth. Therefore, the sale was executed under more advantageous conditions than those of her aunts, who only received $1,000 each for the *totality* of their joint ownership of one sixth.

whatever is necessary to finish the estate proceedings, for which a one-year term is fixed." The executor did not formally accept the office nor did he take an oath for the execution thereof. Letters of executorship were not issued to him by any competent court. Nor did he waive it in the manner provided by law.

In May 1955, Eva Marta Piazza Cintrón and her mother Cándida Cintrón, brought an action against José Américo Piazza Olaya and legatee Ana Carmen Piazza Moreschi, praying for the (a) declaration of nullity of the two contracts of sale whereby said defendant had acquired from the heirs and the legatee their corresponding rights in the undivided interest of one sixth in the Concepción farm belonging to Alejandro Antonio Piazza; and (b) that they be ordered to pay their share in the fruits produced by said farm.

The trial court dismissed the complaint, but after having considered a motion for reconsideration presented by plaintiff, it proceeded to render a new judgment favorable to the latter. After making findings as to the afore-mentioned facts,[2] it concluded that (a) the sale made by plaintiffs to

---

[2] The findings of fact of the trial court are as follows:

"1. That codefendant José Américo Piazza Olaya was appointed as universal testamentary executor by his brother Alejandro Piazza Olaya in the will executed by the latter on October 13, 1949, before Notary Adrián Alfonso Muñiz, from Yauco, and as such he was in the possession and custody of all the property left by the testator, who died on February 15, 1952.

"2. That the deceased Alejandro Piazza Olaya left in his will the free third to his niece Ana Carmen Piazza Moreschi, and appointed as the sole and universal heirs his daughter and wife, Eva Marta Piazza Cintrón and Cándida Cintrón Luca, respectively, plaintiffs in this case.

"3. That on May 5, 1953 and by public deed executed before Notary Luis López de Victoria, José Américo Piazza Olaya bought from plaintiffs, heirs of Alejandro Piazza Olaya, two thirds of the one sixth interest which belonged to the deceased in the 200-cuerda farm referred to in this complaint, for the price of one thousand six hundred and seventy-seven dollars and sixty-six cents ($1,677.66), of which he paid to the heirs one thousand dollars ($1,000) in legal currency and withheld the

defendant was void because it violated § 1348 of the Civil Code; (*b*) the sale made by the legatee was void because since it was a case of a generic legacy, she could not dispose of a specific part of the property of the inheritance estate; and (*c*) the claim for fruits was not appropriate because its amount was not satisfactorily proved—the value of the crops and expenses for their production—but it pointed out that this was "without prejudice that they be claimed by the interested party in an independent action." An appeal was taken from this judgment.

## I

Section 1348 of the Civil Code (31 L.P.R.A. § 3773) equivalent to § 1459 of the Spanish Civil Code, provides:

"The following persons can not acquire by purchase, even at public or judicial auction, neither in person nor by an agent:

"1. The guardian, the property of the person or persons who may be under their guardianship.

"2. Agents, the property the administration or sale of which may have been intrusted to them.

---

rest for the payment of a credit which he alleged to have against plaintiffs' predecessor.

"4. That on March 8, 1954, legatee Ana Carmen Piazza Moreschi requested and obtained from the Registrar of Property of San Germán, in view of the death certificate of the deceased Alejandro Piazza Olaya and of the will as well as other documents, the registration in her favor of one third of the one sixth undivided interest which corresponded to the deceased in the above-mentioned 200-cuerda farm.

"5. That by deed of June 3, 1953, before Notary Celestino Vargas Hernández, legatee Ana Carmen Piazza Moreschi sold to her father José Américo Piazza Olaya, one third of the one sixth interest corresponding to the deceased in the above-mentioned 200-cuerda farm, a deed which was also recorded in the Registry of Property of San Germán.

"6. That on the date of the registration and sale of said one third interest determined by legatee Ana Carmen Piazza Moreschi, no liquidation or division had been made of the estate of the deceased Alejandro Piazza Olaya, nor had the legatee requested payment of her legacy from the heirs of the predecessor.

"7. That defendant José Américo Piazza Olaya and another person named Felipe Piazza have periodically delivered sums of money to plaintiff Eva Marta Piazza Cintrón from the products or fruits yielded by the farm referred to in the complaint and plaintiffs have not proved the fruits which said farm might have really produced or the expenses incurred for the crops of said farm."

"3. *Executors, the property intrusted to their care.*

"4. Public officials, the property of the Commonwealth of Puerto Rico, municipalities, towns, and also of public institutions, the administration of which has been intrusted to them.

"This provision shall apply to judges and experts who, in any manner whatsoever, take part in the sale.

"5. Judges, members of the department of public prosecution, clerks of superior and inferior courts, and officials of justice, the property and rights in litigation before the court in the jurisdiction or territory over which they exercise their respective duties, this prohibition including the act of acquiring by assignment.

"From this rule shall be excepted the cases in which hereditary actions among coheirs are involved, or assignments in payment of debts, or security for the goods they may possess.

"The prohibition contained in this number shall include the lawyers with regard to the property and rights, which may be the object of the litigation, in which they may take part by virtue of their profession and office." (Italics ours.)

This provision regarding the contract of sale appears in the chapter dealing with the capacity to buy or sell. Puig Brutau [3] discusses it among the prohibitions imposed upon persons entrusted with selling properties in the name of others, and points out that in these cases the deed of sale may not be executed to the prejudice of certain interests which the judicial policy "specially tries to protect." In other words, the provision under our consideration answers the purpose of avoiding prejudice to the wards, in the case of guardians; to principals in the case of attorneys-in-fact, to the heirs, in the case of executors; and so on. Borrell y Soler [4] points out that the prohibition is justified "for reasons of morality in the prevention of fraud, and in some cases in order to maintain the prestige of certain persons." Professor Velázquez,[5] of the Law Faculty of the University of

---

[3] II-2 Puig Brutau, *Fundamentos de Derecho Civil* 138.

[4] Antonio M. Borrell y Soler, *El Contrato de Compraventa Según el Código Civil Español* 21–22 (Bosch ed., Barcelona 1952).

[5] Guaroa Velázquez, *Obligaciones y Contratos Según la Legislación Puertorriqueña—Contratos Especiales* 7 (1952 ed.).

Puerto Rico, qualifies it as an incapacity of enjoyment, and not of exercise, because it refers to certain groups of persons who are deprived of the very right to buy and sell and adds that "this prohibition lies in the moral consideration that the person in charge of selling something in the name of another might find a conflict between his interest and his duty if he were allowed to buy it" (*op. cit.* at p. 9),[6] *Zayas v. Orraca*, 80 P.R.R. 327, 334 (1958). Scaevola,[7] in commenting § 1719 of the Spanish Civil Code, adduces that the present doctrine assumes the position that these legal prohibitions are grounded on the "incompatibility of interests and consequent danger that *a single will* should take advantage on its own behalf of the opportunity that the possibility of the self-contracting offers it." (Italics ours.) Santamaría,[8] citing the Italian author Francesco Messinero, points out that it would be more correct to call them incompatibilities instead of prohibitions. Ruggero Luzzato, Professor of Civil Law at the University of Geneva, states in his work *La Compraventa Según el Nuevo Código Civil Italiano* (translation by Francisco Bonet Ramón, Editorial Reus, 1953 ed.), in commenting a similar provision:

"The general concept is this: the lawmaker has considered it inappropriate that the persons who are acting as guardians of other persons or entities may buy the property from their protégées, because they might be led to prejudice the interests which they should, on the other hand, protect, and ordinarily, would give rise to suspicions; also, it is considered dangerous that the officers, by whose administration certain properties are

---

[6] Castán expresses himself in similar terms in referring to Planiol, when he states:

"This group of prohibitions is grounded, rather than on technical obstacles of the so-called self-contracts, on the consideration of moral order pointed out by Planiol, that the persons in charge of selling something in the name of another might find a conflict between his interest and his duty if he were allowed to buy it. . . ." (4 *Derecho Civil Español, Común y Foral* 67 (1956 ed.).

[7] XXVI-II Scævola, *Código Civil* 130 (1951 ed.).

[8] II Santamaría, *Comentarios al Código Civil* 492 (1958 ed.).

sold, may be their purchaser, since they could be led thereby to misconduct in their duties, which require impartiality and righteousness.

"Despite a certain similarity between these cases and those of inability to act, the differences are serious: (1) The rules regarding incapacity are based in general, in the *natural inaptitude* of the subject; on the other hand, those under our consideration now are grounded on reasons of *social convenience*. (2) The rules as to the incapacity embrace *all the activities* of the subject or some phase of the same, whereas here, contracts in *individual cases* are forbidden. It may be observed above all, that from incapacity arises the impossibility that the subject may express his own will effectively, or rather, the need that the expression of his will be complemented by elements of protection (the representation of the father, of the guardian, appearance of the curator, etc.), but the contract may be executed in the interest and on behalf of the incapacitated; however, in the cases afore-mentioned, the incapacity is of another type, one of a more deeper meaning, that is, in the sense of the *juridical incapacity,* not of the *incapacity to act,* because the above-mentioned norms foreclose the possibility that certain contracts of sale may be executed by certain individuals, who therefore, may not conclude them neither *directly nor otherwise."* (Italics ours.)

 Precisely, due to the prohibitive nature of the provision, the same has been construed strictly, that is, it has not been extended in its application to any case except those cases which clearly fall within the letter thereof. *Zayas* v. *Orraca,* 80 P.R.R. 327, 333 (1958). Hence, in the case of executors it is necessary that the property be entrusted by reason of the executorship and that the prohibition be of a temporary nature, which exists only if at the very moment of the sale he has been entrusted with the property object of the sale. And in the case of executors for a particular purpose, the impediment is not extended to those properties which, even though they form part of the estate, are not under their immediate custody, prevailing only as to those specially entrusted thereto.[9]

---

[9] 5 Valverde, *Tratado de Derecho Civil Español* 376 (1926 ed.).

■■ The prohibition as to the agent acquiring property with whose administration or alienation he is charged, has been the object of more frequent interpretation as to its scope and limitations. See *Latallalde* v. *Registrar*, 66 P.R.R. 646 (1946); *Fernández* v. *Laloma*, 56 P.R.R. 348 (1940); *Falagán* v. *Registrar*, 40 P.R.R. 405 (1930); *Luce & Co.* v. *Registrar of Guayama*, 33 P.R.R. 473 (1925), set aside in 20 F.2d 115 (1927); *Sucs. of Sobrino, Fernández & Co.* v. *Reg. of San Juan*, 27 P.R.R. 425 (1919); *Rosenstadt & Waller, Inc.* v. *Reg. of Caguas*, 23 P.R.R. 269 (1915); *Turner* v. *Registrar of San Juan*, 22 P.R.R. 535 (1915); *Giménez* v. *The Registrar*, 21 P.R.R. 314 (1914). But both being grounded on the same reasons previously mentioned, we may resort to the interpretations where the fiduciary relation exists between the principal and the agent in order to fix in turn the scope of real application in the case of executors.[10] The Judgment of June 17, 1920 (150 *Jur. Civ.* 623), is truly significant then, to the effect that the legal provisions only prohibits agents "according to its contents from acquiring either in person or through an intermediary the property the administration or alienation of which is entrusted to them at the time of the sale, which is not the case of the contract in which the agent *does not act in the dual personality of vendor and purchaser. . . .*" (Italics ours.) See, Judgment of the Supreme Court of Spain of November 12, 1907 (109 *Jur. Civ.* 110, 122). In other words, when there does not exist *a single conjugation* of will of the statements required in a bilateral contract such as that of sale, the afore-mentioned prohibition is not applicable. This is particularly true when the very principal, or heir in our case, participates directly or personally in the execution and completion of the contract. It so appears in the Judgment of June 3, 1949 (III *Jur. Civ.* 27, 46) in the following terms:

---

[10] See, X Manresa, *Código Civil Español* 129-136 (1950 ed.).

"Whereas in the fourth averment made pursuant to subd. 1 of article 1.692 of the Procedural Law, the validity of the contract of sale is challenged on the ground of lack of capacity of the purchaser, who having been vested with power to administer the thing sold, incurs in the prohibition established by subd. 2 of article 1.459 of the Civil Code, but this argument which is apparently irrefutable loses all its force in the present case if it is borne in mind: first, that in the afore-mentioned contract the purchaser does not act by virtue of his power of attorney, but in his own name, and it is the owner himself who directly formalizes the contract, for which reason the agent's personality became void in said act due to the principal's intervention, and under such circumstances the case law has established that, despite the terms of the provision, the prohibition contained in subd. 2 of the above-mentioned article 1.459 of the Code is not applicable (Judgment of June 17, 1920) . . . ."

■ We likewise interpreted the provisions of subd. 2 of § 1362 of the Civil Code of 1902, corresponding to § 1348 of the present Civil Code, in *Mancheño* v. *Le Brun et al.*, 14 P.R.R. 461 (1908), where we pointed out at p. 470, that from the moment that the principal himself sells the property to his agent, the agency ceases and thus, the legal ground for the incapacity disappears, such incapacity consisting in that the agent forms with the principal a single juridical person. Subsequently, we cited this interpretation with approval in *Silva Brothers & Co.* v. *Registrar of San Juan*, 28 P.R.R. 164, 168 (1920), and we repeated that this prohibition of the law has always being construed strictly "because it tends to restrain the freedom of contracting." In *Zayas* v. *Orraca*, 80 P.R.R. 327, 334 (1958), we stated that relative incapacity may be correctly applied, provided that the agent at the execution of the sale act in the dual capacity of vendor, bearing another's representation, and of purchaser in his own and personal right. However, in the case of *Grillo* v. *Registrar*, 62 P.R.R. 652 (1943), we applied the above-mentioned section in order to decide that a contract

of mortgage credit executed by an heiress in favor of an executor violated its provisions. We departed from the criterion of strict construction and we intervened in the contractual relations of the executing parties. Now then, we have carefully examined the record in this appeal and we are satisfied that the question was not raised in the manner in which it was discussed in this opinion, and that therefore, the afore-mentioned decision is not in conflict with the opinion which we now express. However, for a greater certainty in the case law, any statement contrary to the rulings herein which might be found in the *Grillo* case is hereby overruled.

*Pabón* v. *Registrar*, 75 P.R.R. 435 (1953) is distinguishable from the situation at bar, for although it was a question of the cancellation of a mortgage at the execution of which the creditor appeared—an emancipated minor—the mortgage debtor—the mother of the minor—had to appear not only as such debtor but as a mother with patria potestas in order to substitute the alleged lack of capacity of the daughter, as provided by § 237 of the Civil Code. We stated that "if the person called upon to substitute that lack of capacity happens to be the same person on whose behalf the alienation is made, it is unquestionable that the fundamental purpose of the lawmaker is defeated." *Cf. Alvarez* v. *Sec. of the Treasury*, 80 P.R.R. 15, 55 *et seq.* (dissenting opinion) ; *Belaval* v. *Court of Eminent Domain*, 71 P.R.R. 246 (1950). But in this case the vendor heiress was of legal age, and in the full enjoyment of her civil rights, a public school teacher, and nothing suggests—as the trial court insinuates—that the purchasing executor took undue advantage of his position. On the contrary, the transaction made followed the same pattern as the previous purchases made to the other co-owners. See, *Seoane* v. *The Registrar*, 23 P.R.R. 753 (1916).

410

In the State of Louisiana a similar solution has been imposed in interpreting provisions regarding the executor's incapacity to acquire property from the estate. See, §§ 1146 and 1790 of the Civil Code (4-6 West's Louisiana Civil Code 676 and 426, 1952 ed.), substituted in 1960 by § § 3194 and 3195 of the Code of Civil Procedure (7 West's Louisiana Code of Civil Procedure 232 and 236, 1961 ed.) ; *Michand* v. *Girod et al.*, 4 How. 554 (1846) ; *Crow* v. *Griffin*, 6 La. Ann. 316 (1851) ; *Ross* v. *Ross*, 3 La. Ann. 533 (1848) ; *Powers of a Succession Representative in Louisiana*, 27 Tul. L. Rev. 87, 104-105 (1952).

 There is, in our opinion, an additional reason—giving effectiveness to the afore-mentioned strict construction—for rejecting the trial court's position on the violation of § 1348 of the Civil Code.[10a] In the first place, as we previously stated, the property is to be entrusted to the executor by reason of his office. *Cf. Bengoa* v. *The Registrar of Property*, 14 P.R.R. 105 (1908). Under the circumstances of the present case the evidence clearly shows that the property was entrusted to defendant José Américo, not because he was appointed executor by his deceased brother, but because he had been administering them for more than 25 years for his father's benefit, first, and for the heirs' benefit thereafter by virtue of "a family agreement." The undivided interest belonging to plaintiff did not come under his administration as a result of the death of the testator; it already was, even during the testator's life. And this is more definite when we consider that there never existed a formal acceptance of the office with the corresponding making of

---

[10a] Defendant alleges that this case is covered by the exception regarding inheritance suits mentioned in the second paragraph of subd. 5 of § 1348 of the Civil Code. This exception does not cover the acquisition by the executors of the property entrusted to them. XXIII Scævola, *op. cit.* at 422 (1906 ed.).

inventory,[11] but merely a tacit acceptance according to the provisions of § 820 of the Civil Code (31 L.P.R.A. § 2517).[12]

## II

Invoking *Escalona* v. *The Registrar of Property*, 9 P.R.R. 523 (1905), the trial court decided that the sale made by legatee Ana Carmen Piazza to her defendant father is void on the ground that "if the legacy was not a specific and determined thing, but generic or of quantity, the legatee may not dispose of a specific part of the property of the inheritance."

In the above-mentioned administrative appeal a recognized natural daughter of the testator had been appointed as legatee of one half of one fifth of the property of her father, and requested that one tenth of the value of a specific property of the estate be recorded in her favor. When the decision denying the registration was affirmed, it was held that since the partition of the testamentary estate had not yet been made, the legatee had no right of action to demand the

---

[11] The express acceptance of the office is governed, as to the formal requisites, by § 597 of the Code of Civil Procedure (32 L.P.R.A. § 2571), which provides:

"Every executor who accepts his appointment under a will shall be obliged to file with the officer in whose office the will is recorded a written acceptance thereof, with his oath of office, binding himself to discharge his duties as executor to the best of his ability, and in default thereof he shall be unable to take possession of the property of the decedent. The part of the Superior Court of the last domicile of the decedent or of the place where his property is situated shall, on the filing of a certificate of the notary or other proper officer that such acceptance and oath of office have been filed, issued letters testamentary to the executor, which shall be evidence of his authority. When any administrator has filed his bond and an oath of office, the judge or court that shall have appointed him, shall issue to him letters of administration, over its seal, as evidence of his authority."

[12] Said section reads as follows:

"Executorship is a voluntary office, and it shall be understood as accepted by the person appointed thereto should he not excuse himself within six days following that on which he has received notice of his appointment, or if he was already aware thereof, during the six days following that on which he had knowledge of the death of the testator."

registration in her favor of definite property of the estate, especially when it did not appear that after it was settled there would be any surplus after payment of the debts, for distribution among the heirs and legatees of an aliquot part.

However, the rigour of this doctrine was noticeably moderated when fourteen years later the case of *Capó* v. *Fernández*, 27 P.R.R. 656 (1919) was decided, wherein after making an ample exposition as to the local and Spanish precedents as to the need of making a partition in order to acquire the registration of an undivided interest in favor of an heir in a specific farm of the estate, we stated that it had been given an "excessive breadth of meaning ... in some of the cases decided by this Court" (p. 663), and we limited its scope because a strict application "would make it impossible in practice to assert claims which are really just" (p. 665). The scope of its effectiveness was limited to those cases where "detached, separate or definite property which were part of an estate but have already been awarded to a certain heir" is claimed, and we pointed out that "the title by inheritance is sufficient when the plaintiff prays for acknowledgment... of the rights that the law itself assigns to him." If we substitute in the present case the designation of the right by the wish of the deceased expressed in his will, we shall obtain the same result.[13] In the present case what was really

---

[13] The Supreme Court of Spain admits in its Judgment of June 14, 1898 (84 *Jur. Civ.* 508) that a legacy of a free third, which is an aliquot part, may be considered as a universal succession. To that effect it stated that the legacy of the free third "as any testamentary provision related to the universality of the inheritance, is to take form after the debts of the inheritance itself are paid." See, also, the Judgment of October 16, 1940, which in considering the concepts of heir and legatee of an aliquot part refers to "its multiple aspects of coincidence to the common note which rules it, *as successors* in title of attribution of property indeterminatedly." It is not necessary to decide this question in the present case, and besides, it would not alter, but rather ratify the conclusion we have reached in disposing of the case. See, Díaz Cruz, *Los Legados* 482–491 (Editorial Reus, 1951).

conveyed by the legatee to her father was an indeterminate right in a specific property of the estate, and as properly put by the latter's counsel in his brief, it was subject perhaps to the conflict which may arise when the partition is made.[14]

However, such a conflict is more apparent than real because plaintiffs themselves were the ones who gave form and specific content to legatee's right over the Concepción farm, since they appeared in order to convey two thirds of the undivided interest which belonged to the testator Alejandro Antonio in said property, and only *afterwards* does the legatee, undoubtedly induced by this acknowledgment of the extension of her share as well as of the remaining third of the undivided interest, convey it by the deed the nullity of which is now sought. Certainly, the interests of justice and fair play could not be better served if we should grant the claim on the mere ground of noncompliance with the requisite of the prior partition whereby the heiress delivers to the legatee a determined portion or property in payment of her legacy. As a matter of fact we decide that plaintiffs' action stated above was equivalent to the delivery, if the same were necessary.

The foregoing is sufficient to relieve us from considering the third error assigned.

For the reasons stated, the judgment rendered by the Superior Court, Ponce Part, on October 18, 1956, is reversed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Hernández Matos did not participate herein.

---

[14] It does not clearly appear from the record that in addition to the Concepción farm the estate consists of other properties. There are references as to the "lower farm" and defendant himself presented in evidence the answer which he filed in a suit for division of community of property brought by his brother Alejandro Antonio—plaintiffs' predecessor—in which other properties are described. We might perhaps gather that the share of said predecessor in the above-mentioned property was also conveyed to his heirs.